ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

ANDREW PAULSON (CABN 267095)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    andrew.paulson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:24-cr-00028-JST |
|     Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE** |
|     v. | |
| BARNABUS JIME, | Date: December 13, 2024 |
|     Defendant. | Time: 9:30 a.m. |
| | Court: Honorable Jon S. Tigar |

## I.     INTRODUCTION

Barnabus Jime served as the money man for rental and romance fraud schemes that bilked more than 100 vulnerable victims of hundreds of thousands of dollars over a multi-year period. After his coconspirators duped the victims into transferring money into accounts that Jime set up using fake identifications, Jime withdrew the money in cash, took his own cut of the proceeds, and then distributed the remainder to other members of the conspiracy. Though Jime did not communicate with any of the victims directly, he played an indispensable role in this scheme.

On August 2, 2024, Jime pleaded guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and agreed to pay at least $840,363.42 in restitution, which accounts for the illicit proceeds he received from both the rental and romance fraud schemes. For the reasons stated herein,

the government recommends that the Court sentence Jime to 30 months' imprisonment and three years' supervised release.

## II.    OFFENSE CONDUCT

Jime used false identification documents to open at least fourteen bank accounts at six financial institutions between June 2021 and May 2023.  After Jime's coconspirators lured the victims in under the belief that they were renting a property or in a romantic relationship, they duped the victims into wiring money into the accounts that Jime controlled.[1]  After receiving the illicit funds, Jime withdrew the money in cash, took a cut for himself, and distributed the rest to his coconspirators.  Jime's financial transactions indicate that he and his coconspirators defrauded approximately 120 victims out of more than $840,363.42.

### A.    The Rental Fraud Scheme

Over at least a two-year period, Jime and his coconspirators defrauded victims into transferring hundreds of thousands of dollars into Jime's accounts for what they believed were payments to secure rental properties.  One of those victims was A.H.  She contacted an individual claiming to be offering a property for rent in Fort Worth, TX, where A.H. was located.  The individual purporting to be the landlord for the property was "David Warder," who claimed he had been notified of A.H.'s interest in the property via turbotenant.com.  A.H. and "Warder" communicated via text message, in which A.H. asked to see the property.  "Warder" assisted A.H. in conducting a self-guided tour of the property by having her download the Opendoor application on her phone, which provided her with a code that opened the door to the property for A.H. to tour.  After the tour, A.H. indicated her interest in renting the property.

After reviewing the lease agreement "Warder" provided her, A.H. signed it and initiated two transfers of funds through Zelle to accounts held by an individual named "Thomas Kirkpatrick," who "Warder" claimed was his lawyer and was authorized to accept funds on his behalf.  The first transfer was for an initial $1,000 "deposit."  The second transfer, which represented "first month's rent" on the property, was for $1,650.  Both transfers were sent on July 6, 2022.  "Warder" asked A.H. for a final deposit, which would represent last month's rent.  A.H. told "Warder" that she would provide the last

---

[1] The government does not have any evidence that Jime himself communicated directly with any of the victims of the rental or romance fraud schemes.

month's rent closer to their agreed-upon move-in date in person. "Warder" attempted to obtain this payment without meeting A.H. in person, only to cease communicating with A.H. after she insisted on meeting "Warder" in person and expressing misgivings about "Warder's" offering being a scam.

Thereafter, A.H. never heard from "Kirkpatrick" again. A.H. told law enforcement that she had no place to live after realizing she had been defrauded and was required to assume substantial debt after transferring those funds to "Kirkpatrick" to find a new home to rent. That debt included borrowing money and maxing out credit cards, all of which required A.H., who has children and works in after school programming, and her husband to take on more work and overtime. As of January 2024, A.H. stated that she was still paying off the debt and needed to repair her credit, almost one year after she was the victim of the scam.

Jime posed as "Kirkpatrick" in these transactions. The funds that A.H. sent to "Kirkpatrick" (at "Warder's" direction) were sent to an account at Bank of America in Kirkpatrick's name ("the Kirkpatrick BofA Account"). Those funds were then sent to a J.P. Morgan Chase account in Kirkpatrick's name ("the Kirkpatrick Chase Account") via a Zelle transfer. Jime subsequently withdrew this money from an ATM in Oakland.

## B.    The Romance Scheme

The rental fraud scheme was not the only way Jime and his coconspirators scammed unsuspecting vicitms. Several individuals who spoke with law enforcement indicated that they sent funds to accounts controlled by Jime in response to requests from individuals with whom they believed they were in an intimate relationship. For example, one of Jime's coconspirators who was claiming to be "Robert Seidenstrucker" used an online dating website, christianlove.com, through which he convinced a victim to send over $32,500 to bank accounts Jime controlled. "Seidenstrucker" told the victim that the funds would be used to help support his children. Those funds were transferred to one of the Kirkpatrick accounts that Jime controlled. After those funds were transferred, the victim never heard from "Robert" again.

In another case, a victim believed they were messaging an individual with the last name "Kirkpatrick" on Instagram—someone they thought was an Estonian mechanic who lacked money to pay his employees, feed himself, or get necessary medical attention. The victim sent money to the Kirkpatrick

account Jime controlled in several instances, including on June 6, 2022, when the victim sent $5,000.  The next day, a Bank of America ATM camera in Emeryville caught Jime withdrawing money from that account.

## III.    THE GUIDELINES CALCULATION

The government agrees with the Guidelines calculation set forth in the Presentence Investigation Report (PSR).  *See* PSR ¶¶ 28-39.[2]  The PSR calculates the offense level as follows:

| Count 1: Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) | | |
|---|---|---|
| | **U.S.S.G. Section** | **Level/Points** |
| Base Offense Level | § 2B1.1(a)(1) | 7 |
| Specific Offense Characteristics<br> - Loss more than $550,000<br> - Greater than 10 victims<br> - Use of authentication feature | <br>§ 2B1.1(b)(1)(H)<br>§ 2B1.1(b)(2)(A)(i)<br>§ 2B1.1(b)(11)(A)(ii) | <br>+14<br>+2<br>+2 |
| Acceptance of Responsibility | § 3E1.1 | -3 |
| Zero-Point Offender Reduction | § 4C1.1 | -2 |
| **Total offense level** | | **20** |

With a Criminal History Category of I and a Total Offense Level of 20, Jime's Guidelines range is 33-41 months.  PSR ¶ 68.

## IV.    OBJECTIONS TO THE PSR

Jime asserts three objections to the PSR, all of which should be denied.

***Facts Regarding the Romance Scheme.***  First, Jime claims that the PSR should not contain any facts related to the romance scheme because it was not mentioned in the Information or Plea Agreement, and therefore should be stricken from the PSR.  The government disagrees.  To begin with, the amount of restitution that Jime agreed to pay in the Plea Agreement ($840,363.42) includes victims of both the rental and romance fraud schemes.  Facts related to the romance schemes are thus directly relevant to that figure.  Additionally, Jime's actions in the romance scheme were part of a common scheme or plan and/or constituted the same course of conduct.  Indeed, he served the exact same role in both schemes, used exactly the same bank accounts, and worked with the same group of coconspirators.  Whether the money

---

[2]  The Plea Agreement leaves open whether the Zero-Point Offender reduction will apply under U.S.S.G. § 4C1.1.  The government does not contest the applicability of the two-level Zero-Point Offender reduction in this case.

transferred to his account was for a rental fraud or a romance fraud, Jime withdrew the money all the same, took a cut for himself, and distributed the rest to his coconspirators.  This constitutes precisely the "common scheme or plan" and/or the "same course of conduct" that are considered "relevant conduct" under the Guidelines.  *See* U.S.S.G. § 1B1.3(a) and Application Note 5(b)(i) (common scheme or plan are offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar <u>modus operandi</u>") and (b)(ii) (acts are considered the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses").

Even if the facts involving the romance scheme were not "relevant conduct" under the Guidelines, the Court should still consider them.  In fact, the Court is statutorily obligated to consider not just "relevant conduct" as the Guidelines define that term, but also facts that pertain to the factors set forth in 18 U.S.C. § 3553(a), which include the "nature and circumstances of the offense and the history and characteristics of the defendant."   In determining an appropriate sentence, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."  U.S.S.G. § 1B1.4; 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  When it comes to evaluating the § 3553(a) factors, district courts enjoy "broad discretion to consider all relevant information" at sentencing, *Concepcion v. United States*, 597 U.S. 481, 491 (2022), so long as the information has "some minimal indicia of reliability to support its probable accuracy," *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001).  *See also Nichols v. United States*, 511 U.S. 738, 747 (1994) (sentencing courts "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come").  "The defendant typically has the burden to show that disputed hearsay is false or unreliable."  *United States v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021).

Here, Jime used the very same bank accounts to collect fraudulent proceeds from victims of the rental and romance fraud schemes.  The facts regarding the romance scheme are therefore critical to the Court's accurate understanding of the nature and circumstances of the offense and the character and

conduct of the defendant.  And there is no indication that the facts regarding the romance scheme are false or unreliable.  Just the opposite.  Jime himself agreed to pay restitution to the victims of the romance and rental fraud schemes alike, thereby confirming his role in both schemes and his obligation to make those victims whole.

**Victim Impact Statements.**  Second, the defense objects to the Court considering the victim impact statements from victims of the romance fraud scheme.  For the same reasons the Court should consider the facts related to the romance fraud scheme, the Court should consider the victim impact statements.  Specifically, even if the victims of the romance scheme are not considered "crime victims" under 18 U.S.C. § 3771(e)(2)(A) with statutory rights to be heard at sentencing, the Court still has discretion to receive and consider their statements.  *See, e.g., Concepcion*, 597 U.S. at 491 (district courts enjoy "broad discretion to consider all relevant information" at sentencing); 18 U.S.C. § 3661.

**Jime's Repeated Pretrial Violations.**  As discussed in more detail below, Jime has repeatedly violated the terms of his pretrial release by, among other things, continuing to smoke marijuana and then lying about it to the Magistrate Judge.  If Jime would like to explain these violations to this Court, he can do so in his sentencing memorandum.  The government agrees with Probation that this is not the type of information that belongs in the PSR.

## V.    BASIS FOR THE REQUEST FOR DOWNWARD DEPARTURE

Pursuant to U.S.S.G. § 5K1.1, the government moves for a one-level downward departure.  During a post-arrest *Mirandized* statement, Jime provided information to the government that was used to charge one of the coconspirators in the rental and romance fraud schemes.  *See United States v. Gwomina Louis Ajayi*, Case No. 4:24-mj-70020-MAG.  A one-level downward departure would make the total offense level 19, which would yield an advisory Guidelines range of 30-37 months.

## VI.    LEGAL STANDARD

The United States Sentencing Guidelines serve as "the starting point and the initial benchmark" of any sentencing process and are to be kept in mind throughout the process.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007).  The overarching goal of sentencing, as set forth by Congress, is for the Court to "impose a sentence sufficient, but not greater than necessary."  *Carty*, 520 F.3d at 991 (citation omitted).  In accomplishing that goal,

the Court should consider the factors set forth under 18 U.S.C. § 3553(a), which include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

## VII.    SENTENCING RECOMMENDATION

The seriousness of the offense, the need for deterrence, and the history and characteristics of the defendant all support the government's 30-month recommendation.  To begin with, the offense here is serious.  Jime and a group of fellow fraudsters worked together to defraud more than one hundred people of hundreds of thousands of dollars.  They preyed on their victims' vulnerabilities as they looked for homes for themselves and/or their families, or they sought companionship.  This predation had devastating effects on some of the victims.  For example, A.H., her husband, and her children, were left with no place to live after she transferred $2,650 to Jime believing she was renting a home for her family.  Instead, that money went right into the pockets of Jime and his coconspirators while A.H., who worked in after school programming, and her husband were forced to borrow money and max out their credit cards—a predicament they were still working through into 2024.

Another victim of the rental scheme was left without a place to live when he moved to Washington, D.C., expecting to have an apartment he thought he had rented after sending $2,640 to Jime's accounts. The victim stated, "I ended up having to move out to DC broke and without a place to live.  It was rather difficult for me emotionally and financially, and it took quite a bit of time to recover."

Jime and his coconspirators also preyed on vulnerable people who believed they were in romantic relationships with the fraudsters.  One victim transferred $32,500 to Jime's accounts believing that money would help support "Robert's" children, when in reality it just enriched Jime and his coconspirators.

A 30-month sentence is also necessary to deter Jime and others who engage in the same behavior. Fraud schemes like Jime's cannot survive without individuals like Jime who are here in the United States and who are willing to open U.S. bank accounts, accept money from the fraud victims, and distribute the money to the other members of the conspiracy, many of whom are in countries that are beyond the reach

of the government's extradition powers. Giving strong sentences to individuals like Jime is often the only way to dismantle and deter these fraud schemes. A 30-month sentence here would send an important message to all those thinking of taking on Jime's role in a similar fraud.

Finally, Jime's behavior on pretrial release demonstrates that he is simply not getting it. Since July 2023, Pretrial Services has filed seven violation notices. Dkts. 17 (marijuana use, curfew violations), 21 (marijuana use, missed drug test), 25 (missed counseling appointments), 35 (marijuana use, missed intake for drug testing vendor), 46 (marijuana use, missed drug testing, missed mental health counseling), 49 (marijuana use), and 51 (missed drug testing); *see also* PSR ¶¶ 6-8. Since the end of October 2024, Jime has received three of those violations.

Perhaps most concerning about this is that when confronted with these recent violations, Jime repeatedly lied to the Magistrate Judge. He claimed that he had last used marijuana on September 18, 2024, and that the subsequent positive drug tests were the result of his chronic marijuana use up to that point. *See* Dkt. 49 at 1. So Pretrial Services had an expert review the positive tests. *Id.* The expert concluded that contrary to what Jime had claimed, Jime had indeed reused marijuana after September 18, 2024, and before the October 2, 2024 urinalysis. *Id.* As a result, Pretrial Services stated that it "believes that Mr. Jime has not been forthcoming about his continued marijuana use." *Id.* Even after this, Jime continued to test positive for marijuana on October 21, and November 4, 2024—approximately a month-and-a-half after he claims to have last used marijuana. Undeterred, at a bail violation hearing on November 26, 2024, Jime continued to deny using marijuana after September 18, 2024, even though he tested presumptively positive for marijuana that very morning—more than two months after his supposed last use.

In short, the seriousness of the offense, the need to deter Jime and others from engaging in similar behavior, and the history and characteristics of Jime support the government's recommendation in this case.

///

///

///

///

**VIII.    CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence Jime to 30 months' imprisonment and three years' supervised release.  Pursuant to the Plea Agreement, the government further recommends that the Court order Jime to pay $840,363.42 in restitution.

DATED:  December 6, 2024                                    Respectfully submitted,

                                                                            ISMAIL J. RAMSEY
                                                                            United States Attorney


                                                                            */s/ Andrew Paulson*
                                                                            ANDREW PAULSON
                                                                            Assistant United States Attorney