1  JODI LINKER
   Federal Public Defender
2  Northern District of California
   JOYCE LEAVITT
3  Assistant Federal Public Defender
   13th Floor Federal Building - Suite 1350N
4  1301 Clay Street
   Oakland, CA 94612
5  Telephone:  (510) 637-3500
   Facsimile:  (510) 637-3507
6  Email:      Joyce_Leavitt@fd.org
7
8  Counsel for Defendant JIME
9

10              IN THE UNITED STATES DISTRICT COURT
11            FOR THE NORTHERN DISTRICT OF CALIFORNIA
12                        OAKLAND DIVISION
13

14  | UNITED STATES OF AMERICA, | Case No.: CR 24–0028 JST |
15  | Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
16  | v. | |
17  | BARNABAS JIME, | **Court:** Courtroom 6, 2nd floor<br>**Hearing Date:** December 13, 2024<br>**Time:** 9:30 a.m. |
18  | Defendant. | |

# INTRODUCTION

Barnabas Jime was born in Nigeria and raised, along with his four brothers, in a strict Christian household where it was expected by his patriarchal father that he would rise above the chaos and civil unrest in Nigeria and succeed, both in education and in life, just as his father had done. Mr. Jime's father was an engineer and Mr. Jime's three older brothers all studied in the United Kingdom and became engineers like him. *See* Presentence Report disclosed November 29, 2024 (PSR) at ¶49. The family struggled when Mr. Jime was a young child; his earliest memories include being tear gassed in elementary school and exposed to multiple school shootings, as well moving around a lot and living with extended family. Despite this, Mr. Jime's father rose in his career and was ultimately able to buy a home and support his children and their educational pursuits. In 2015, when he was 21 years old, Mr. Jime travelled to the United States from Nigeria on a student visa in order to fulfill his father's dictate that he educate himself abroad and then return. However, in 2016, Mr. Jime's father suffered a heart attack and died while Mr. Jime was still beginning his studies in the United States.

With the unexpected death of his father, Mr. Jime's life was "forever changed." *Id*. at 51. Mr. Jime was unable to return to Nigeria to attend his father's funeral and was devastated at the loss of his father. He contemplated suicide and his motivation to succeed died along with his father, as Mr. Jime struggled to find purpose. Mr. Jime became dependent upon marijuana to blunt his depression. He struggled financially, not wanting to take money from his widowed mother, and his life, as he described it to Dr. Jeremy Coles "became increasingly unmanageable." *See* Confidential Report of Psychological Evaluation dated April 22, 2024 ("Coles Report") filed concurrently at p. 5. Mr. Jime was forced to live in his car for a period and was robbed at gunpoint more than once during that time. He continued to enroll in various college programs, but it was too much both financially and mentally for him to continue.

As the pandemic hit and everything closed down, Mr. Jime, who was numb to the world and destitute, met someone in the Nigerian community who asked if he wanted to make money. In that moment, Mr. Jime became involved in the conspiracy for which he will now be sentenced. Mr. Jime's participation in this offense runs counter to the values he was taught; He feels humiliated

because of his actions and how far he strayed from his core values.

The probation officer who prepared the PSR recommends that the Court impose a low-end guideline sentence of 33 months' custody. PSR, Sentencing Recommendation at p. 2. Mr. Jime asks the Court to vary below the advisory guideline and impose a sentence of 12 months plus one day in custody. This request is based not only upon a different balancing of the sentencing factors delineated in 18 U.S.C. § 3553(a) and considered by probation, but also other factors, including the substantial assistance which Mr. Jime provided which led to the prosecution of another. All of these factors warrant a substantial variance and the imposition of 12 months plus one day custody.

Mr. Jime files this memorandum in support of his sentencing request. Attached to the memorandum are (1) letter from Barnabas Jime (Exhibit A); (2) letter from Solomon Terwase Kile-Jime (Exhibit B); (3) letter from David Terhemen Jime (Exhibit C); (4) letter from Joshua Iorwuese Jime (Exhibit D); (5) letter from Charity Nguhemen Jime (Exhibit E); (6) letter from Joshua T. Vihishma (Exhibit F); and (7) Criminal Complaint in *United States v. Gwomina Louis Ajayi*, CR 4:24-mj-70020-MAG (Exhibit G). Filed concurrently *under seal* is the (i) Confidential Report of Psychological Evaluation of Jeremy Coles dated April 22, 2024 ("Coles Report" or Exhibit 1); and (ii) the California State University, Sacramento Student Health and Counseling Services notes of Mr. Jime's mental health appointment on 07/02/2020 ("CSU Record" or Exhibit 2).

## OBJECTIONS TO THE PSR

Mr. Jime withdraws his objections to the PSR which are noted in the Addendum to the Presentence Report. The first and second objection relate to the probation officer's inclusion of information regarding a romance scheme as part of the offense conduct as well as the submission of victim impact statements to the Court from individuals hurt by the romance scheme. *See* PSR, Addendum. While the government agrees that none of the victims of the romance scheme should be considered a "crime victim" under 18 U.S.C. § 3771(e)(2)(A) because Mr. Jime was neither charged with, nor pled guilty to involvement in a romance scheme, it has argued that the Court can consider the statements and information as "relevant conduct." Mr. Jime has agreed to pay restitution for both schemes, which does make it relevant, and therefore withdraws objections one and two.

The third objection identified by probation relates to Mr. Jime's request that the probation

*JIME*, CR 24–0028 JST
2

officer include mitigating information regarding his pretrial violations in the PSR, which it has declined to do. PSR, Addendum. Probation is correct that the violations were resolved by Judge Ryu who recognized that Mr. Jime was struggling with his mental health issues and addiction to marijuana, as well as with financial issues. Mr. Jime therefore withdraws this objection as well.

## DISCUSSION

**A.  A sentence of 12 months plus one day custody is sufficient but not greater than necessary to meet the goals of sentencing**

The Court is aware of the directives of *United States v. Booker*, 543 U.S. 220 (2005), and the sentencing factors listed in 18 U.S.C. § 3553(a). The Court must consider, among other factors, the advisory sentencing range, the history and characteristics of the defendant, the nature and circumstances of the offense, and other factors. 18 U.S.C. § 3553(a)(1), (a)(4) and (a)(6). The factors detailed in § 3553(a) assist the Court in fulfilling the mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). "The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary," to serve the statutory purposes of sentencing. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting § 3553(a)). When the sentencing factors and other considerations are weighed in this case, it is clear that a term of 12 months plus one day custody is sufficient to serve the statutory purposes of sentencing.

**1.  Mr. Jime's history and characteristics warrant a downward variance**

**i.  Upbringing and trauma**

Under 18 U.S.C. § 3553(a), Mr. Jime's history and characteristics are relevant to this Court's sentencing decision. As described above, Mr. Jime is one of five boys born to his parents and raised in Nigeria. PSR at ¶ 50. When Mr. Jime was young his family moved around a lot and struggled financially, and Mr. Jime recalls ten people living in a two-bedroom apartment at one point. *Id*. However, Mr. Jime's father ultimately achieved financial success and Mr. Jime spoke of how he "had a better childhood than most African children."[1] Coles Report at p. 4. Specifically, Mr. Jime talked

---

[1] Nigeria is widely categorized as a developing country with significant poverty and inequality issues.

DEFENDANT'S SENTENCING MEMORANDUM
*JIME*, CR 24–0028 JST

3

about some of the traumatic experiences he recalled as a child growing up in Nigeria, including being tear gassed in elementary school.[2] PSR at ¶ 50. He also recalled police officers shooting at civilians, as well as school shootings, including one during which he and a group of students ran into the music room and shut the windows but not before one person was shot in the head and died in front of him.[3] Mr. Jime also had a childhood friend die in a plane crash when he was in seventh grade. PSR at ¶ 50. And so while Mr. Jime's parents undoubtedly tried to shield their children from the surrounding poverty and dysfunction even as they struggled themselves at times, growing up in a community in which these events occurred traumatized Mr. Jime and undermined his sense of security, as did the pressure he felt to meet his father's high expectations of him. PSR at ¶ 51. All of this contributed to his subsequent involvement in the offense as he later struggled to make sense of his life.

### ii. Death of Mr. Jime's father

Within a year of Mr. Jime's arrival to the United States, his father died unexpectedly of a heart attack. By all accounts, it was this this inflection point from which Mr. Jime was unable to recover. Mr. Jime explained it this way:

> I spoke to him the week before he died . . . and . . . never got to talk to him again. . . I never understood the feeling of loss until then. My dad was the one person that I could trust and rely on . . . it was more than I could take . . . I was looking for someone to blame . . . I was alone . . . trying to figure out what I am going to do with my life . . . I wanted to die.

Coles Report at p. 5. Even worse, Mr. Jime was unable to attend his father's funeral out of fear he would not be allowed back in the United States. His mother told him not to come back: "They took the decision from me and that tore me up." *Id*. In their letters to the Court, Mr. Jime's family confirmed that the senior Mr. Jime's death was felt most by Mr. Jime:

> We all as a family were greatly affected by our father's death . . . my little brother . . . could not even come back for his burial . . . and since then he has not quite been himself . . . without my father . . . the glue that held him together was not there anymore.

---

See https://futures.issafrica.org ("Nigeria. . . faces serious social, economic and security challenges, insurgency, banditry. . . corruption and mismanagement . . . extreme poverty")
[2] Tear gas causes symptoms which include excessive tearing, burning blurred vision, difficulty swallowing, chest tightness, coughing, choking sensation, wheezing, shortness of breath. *See* https://www.cdc.gov/chemical-emergencies/chemical-fact-sheets/riot-control-agents
[3] This information was included in undersigned counsel's notes from the PSR interview.

DEFENDANT'S SENTENCING MEMORANDUM
*JIME*, CR 24–0028 JST

Exhibit B. *See also* Exhibit C ("In 2016 our father suddenly past [sic] away . . . Barnabas was without support or comfort to help him grieve properly."); Exhibit D ("With the death of our biological Father and the fact that we have to navigate this wide world without guidance and support . . . the defendant has been hit hard by this reality."); Exhibit E ("The sad sudden death shook us all but Barnabas was affected the most.").

This loss marked the point at which Mr. Jime's mental health started to deteriorate rapidly, a deterioration which never subsided over the years. Even four years after his death in 2020, Mr. Jime had one appointment with a mental health professional in which Mr. Jime reported that he still "has struggled since his father unexpected death . . . his father was a major source of support and guidance . . . [and] that since the death . . . he feels a sense of void and lack of direction in life." CSU Report at p. 2 (noting that Mr. Jime cried when discussing the death of his father and his feelings of emptiness due to his father's passing.)

### iii.   Diminished capacity including depression and drug dependence

Mr. Jime's reduced mental capacity, including his feelings of emptiness, depression, and suicide, is a mitigating factor which contributed to the commission of the offense. Mr. Jime's depression became all-consuming after his father's death; at one point he even contemplated jumping in front of a moving train. PSR at ¶ 57; Coles Report at p.5 ("I wanted to die… I was so depressed."). Mr. Jime attended the one counseling session in 2020 and while continued counseling would have been helpful, for Mr. Jime "it was too much to bear. . . too much emotional stuff came up." Coles Report at p. 7. Moreover, according to Mr. Jime in Nigeria there is a stigma attached to anyone who seeks mental health treatment and when Mr. Jime told his mother he was going to see a psychologist, she laughed at him. *Id*. As a result, Mr. Jime was reticent to talk about his depression, not only to a professional but also to his family. Instead, Mr. Jime started smoking marijuana every day to help him with his grief, depression, anxiety and overthinking.  PSR at ¶ 59; Coles Report at p. 5 ("That's when I started smoking more pot. It was a life saver. When I felt any sort of way, I would smoke it and it would keep me at peace. I was so depressed.").

Mr. Jime's significantly reduced mental capacity contributed to the commission of the offense as he was unable to think clearly or connect to the values he had been taught growing up. In addition,

Mr. Jime's drug use does not negate the applicability of this factor. *See, e.g United States v. Cantu*, 12 F.3d 1506, 1512, 1516 (9th Cir. 1993); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993). The Court should consider this mitigation in determining the appropriate sentence.

### iv. Post offense rehabilitation, aberrant conduct and sincere remorse are reasons to vary downward in this case

This Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *See United States v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentence or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct— [is] a critical factor to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (*citing Pepper v. United States*, 562 U.S. 476, 491-93 (2001)). Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (*quoting* 18 U.S.C. § 3553(a)(1)).

In his letter to the Court, Mr. Jime talks about his post-offense rehabilitation:

> Since my arrest resources were provided to me and these have helped me push forward. Through counseling, I have gained valuable insights and coping strategies. I dealt with the sudden passing of my father which ultimately caused redirection in my life . . . I also worked for a non-emergency medical transport company where I helped individuals with special needs reach their medical appointments . . . [which has] given me a renewed sense of purpose . . . I plan to finish my bachelor's degree, honoring my father's sacrifices for my education. I aim to utilize the lessons learned to support my community. . . demonstrating my commitment to change will take time, and I am prepared to work diligently toward this goal.

Exhibit A. Mr. Jime's letter also demonstrates that his involvement in the offense constitutes a marked divergence from an otherwise law-abiding life, which is another mitigating factor:

> My parents . . . [taught us] Christianity, respectful morals, education and dedicated hard work . . . My actions before my arrest are not things I am used to or how I was raised and this makes me saddened to stray away from my upbringing . . . these victims could have easily been any one of my family or friends.

*Id*.

In their letters to the Court, Mr. Jime's family members also reference Mr. Jime's remorse, aberrant conduct and rehabilitation. *See, e.g* Exhibit B ("My brother . . . has learnt his lesson and will

. . . seek help, counseling and guidance . . .to . . . refocus on being a useful member of society."); Exhibit C ("Barnabas confessed to me his faults . . . expressed his remorse . . . I believe he is sincerely remorseful of his actions and  . . am confident he will continue to make every effort to atone . . . and not repeat such in the future."); Exhibit D ("this [offense] is not the character of . . . my brother . . . he feels remorse and anguish for his part in this case."); Exhibit E ("I have spoken with my son and  . . . he has admitted . . . his faults . . . expressed regrets and remorse about his misconduct and poor decision making . . . and stated his desire to make amends . . . I believe he will make every effort to take responsibility for his misdeeds and make necessary changes in character and deeds."); Exhibit F ("Barnabas . . .  sounded remorseful and ashamed, yet accepted full responsibility for his actions . . . the Barnabas I know does not have a history with crime and this is the first time I have heard that he is involved with such serious offences [sic]. . . Barnabas . . . will . . . work towards restitution, no matter how long it may take him."). *See also* Coles Report at p. 10-11 (the evaluation "reveal[ed] Mr. Jime to be a young man who lived a prosocial, fairly straightforward and law abiding life up until his father died unexpectedly . . . historically, he has been an ethical man . . . and, at present . . . expresses genuine remorse for his current actions.")

Since his arrest and placement on supervision in June, 2023, Mr. Jime attended individual therapy for more than a year through pretrial services which was very helpful to hm, especially given that Mr. Jime did not tell his family about the pending federal case until six months after his arrest, which added to his stress and isolation.[4] Mr. Jime has been working hard to rehabilitate himself. Exhibit A. He is remorseful and understands the gravity of his action. *Id*. Mr. Jime's post-offense rehabilitation, return to his core values and remorse are factors which support a sentence of 12 months plus one day as requested.

---

[4] As described above, Mr. Jime was dependent upon marijuana to relieve stress and anxiety but once he started counseling, he was able to stop. In addition, the location monitoring condition was removed because Mr. Jime complied with this condition for four months, from the day of his release on June 5, 2023, until October 12, 2023, and Judge Ryu determined that it was no longer necessary. Judge Ryu also agreed that the counseling could be terminated after more than a year and acknowledged the reasons for that modification. Despite other issues that arose, Judge Ryu made it clear to Mr. Jime that she could see that he was struggling but that he was also trying and putting forth effort to comply with his conditions.

**2.      The Nature and Circumstances of the Offense Conduct**

The Court should consider the nature and circumstances of Mr. Jime's offense conduct. 18 U.S.C. § 3553(a)(1). Mr. Jime agrees that the offense conduct was serious and that many individuals were harmed as a result of the overall conspiracy in which he participated. PSR at ¶ 26; Exhibit A. For this reason, Mr. Jime is not asking the Court to impose a non-custodial sentence. While the scope of the overall conspiracy is highlighted in the PSR, as well as in Mr. Jime's plea agreement, PSR at ¶¶8-17; Plea Agreement at ¶ 2, Mr. Jime's actual role in the conspiracy is much narrower. Mr. Jime's offense conduct involved his opening bank accounts using false passports which were provided to him by another co-conspirator, and then distributing the funds which flowed into those bank accounts from individuals who Mr. Jime "did not know" and "never contacted." Plea Agreement at ¶ 2.

Mr. Jime agrees in the Plea Agreement that he was aware that the co-conspirators were engaging in fraudulent activities because transfer memos associated with the funds being transferred into the accounts referenced "security deposit," "first and last month," as well as references to rent and application fees. *Id*. And he further acknowledges that the bank accounts which he opened were used similarly to receive funds from individuals related to a romance scheme whom he did not know, nor ever contacted but were also harmed by the conspiracy.[5]

In sum, Mr. Jime opened bank accounts based on fake documents which were provided to him, followed instructions as to what to do with the funds and how much he would be allowed to keep, and sent the majority of funds elsewhere. Mr. Jime never contacted individuals to convince or manipulate them to part with their money, did not create the schemes, did not create websites, and did not search for, or ever communicate with any victims. Mr. Jime was not tasked with any independent decision-making role but rather followed the instructions that he was given.

As the Court considers the nature and circumstances of the offense, it is significant that Mr. Jime's role in the offense was ministerial rather than discretionary. Had Mr. Jime been involved in

---

[5] Victims of a romance scam included Victim Impact Statements to the Court asserting that Mr. Jime personally took steps and made representations in order to convince them to part with money. However, it is undisputed that Mr. Jime never spoke directly with any victims or otherwise convinced individuals to send money to the accounts he controlled. Mr. Jime's role was unchanged. Plea Agreement at ¶2.

DEFENDANT'S SENTENCING MEMORANDUM
*JIME*, CR 24–0028 JST

8

acts such as devising schemes, contacting individuals and manipulating them into parting with their money, and other organizational involvement, it would present a different picture of Mr. Jime. Mr. Jime's role in the overall conspiracy is mitigating in that he has agreed to pay the total loss amount and faces the same advisory guideline range as other co-conspirators who played a more active role in targeting and soliciting victims, and personally manipulating them into parting with their money. Here, the nature and circumstances of the offense, and Mr. Jime's role in the overall conspiracy to which he has pled warrants a downward variance from the applicable guideline range. This conclusion is further supported by the JSIN data included in the PSR.[6] PSR at ¶84. Mr. Jime requests a variance and imposition of a 12 months and one day of custody.

### 3. Immigration consequences including continued detention and other Collateral consequences

The instant conviction is serious, and despite Mr. Jime's lack of criminal history, it is certain that Mr. Jime will be deported following completion of his sentence. Because of the nature of the charges, the conviction will also trigger severe immigration penalties beyond deportation, foreclosing likely every avenue of relief that Mr. Jime would otherwise have been able to pursue as a potential defense in immigration proceedings. Instead, Mr. Jime likely will be rendered permanently inadmissible to the United States and barred from re-entry for the rest of his life.[7] Furthermore, before he is deported, Mr. Jime likely will spend an uncertain period of time in immigration detention – a time period that could easily stretch to months – which will be an additional custodial consequence of his conduct. A lesser sentence is warranted for this reason as well.

### B. Mr. Jime should get an additional reduction in his sentence based upon his substantial assistance

---

[6] The Judiciary Sentencing Information (JSIN) included in the PSR indicates that for defendants who have the same advisory guideline range of 33-41 months, the average length of sentence imposed is 25 months custody. PSR at ¶84. However, the JSIN calculation excludes individuals who receive substantial assistance reductions which Mr. Jime should receive. In addition, the JSIN information does not distinguish between defendants who target, solicit and manipulate individuals into parting with their money and making discretionary decisions, as opposed to Mr. Jime who received the passports to open the accounts, and was told where and how much money to send once it came into the account. Taking account of these significant differences means that Mr. Jime's sentence should be substantially less than the 25-month average length of imprisonment identified by the JSIN.

[7] This ban may apply to other countries as well who do not allow individuals with felony convictions into their country.

DEFENDANT'S SENTENCING MEMORANDUM
*JIME*, CR 24–0028 JST

9

Mr. Jime should receive a variance from the advisory guideline range based upon his substantial assistance. At the time of his arrest on June 5, 2023, Mr. Jime waived his Miranda rights and admitted to his role in the offense conduct for which he was being arrested. Exhibit G at p. 9. Mr. Jime was asked about potential co-conspirators and responded truthfully, answering the agent's questions and pointing to identifying information of others contained in his cellular phone which had just been seized from the agents. *Id*. Although Mr. Jime decided not to enter into a cooperation agreement with the government because of concerns relating to his safety and other reasons, unbeknownst to Mr. Jime the government used the information provided by him in support of its prosecution of another individual, and included both Mr. Jime's name, as well as his picture in that publicly filed complaint. *See* Criminal Complaint in *United States v. Gwomina Louis Ajayi*, CR 4:24-mj-70020 MAG attached as Exhibit G. Mr. Jime had been reticent to cooperate, in part, out of concern for his safety. The public filing of the complaint in Mr. Ajayi's case has placed him in danger. Although the parties did not enter into a cooperation agreement and it is the government's prerogative to either file or not file a motion under U.S.S.G. § 5K1.1, even in the absence of such a motion there is more than enough information in the complaint itself to warrant the Court granting a variance pursuant to § 3553.

The factors relevant to weighing a substantial assistance departure are instructive here: (1) the significance and usefulness of the defendant's assistance; (2) its truthfulness and completeness; (3) the nature and extent of the assistance; (4) risks to the defendant in assisting authorities; and (5) the timeliness of the assistance. U.S.S.G. § 5K1.1(a). In this case, Mr. Jime provided information which was significant and useful enough that it formed the basis for the complaint in the prosecution of another individual. Exhibit G. In addition, the information was truthful and complete as the complaint states that the information provided was corroborated through text messages, bank records and other documentation. Exhibit G at p. 9-12. Third, the nature and extent of the assistance has already led to

the prosecution of another. Exhibit G. Furthermore, it was timely in that Mr. Jime waived his Miranda rights and spoke with agents *immediately* upon his arrest. Exhibit G at p. 9. Finally, as a result of the information that he provided being included in a public document with his unredacted name and other identifying information, Mr. Jime was placed at risk, such that he rarely goes outside because he is afraid he might get assaulted, he has gotten off of social media and his safety in the community has been jeopardized. Coles Report at p.3.

Putting Mr. Jime in custody for any length of time when he already has been marked as a cooperator in a publicly filed complaint with both his name and his picture included, along with the assistance he provided, puts Mr. Jime in harm's way and unnecessarily exposes him to people in custody who are not on his same path. For this reason as well, a substantial variance and imposition of 12 months plus one day is warranted in this case.

## CONCLUSION

For the reasons set forth above, Mr. Jime respectfully requests that the Court vary downward and impose a sentence of 12 months plus one day of custody. Such a sentence is sufficient but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated: December 6, 2024

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S/
JOYCE LEAVITT
Assistant Federal Public Defender